# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-3498
_____

United States of America

*Plaintiff - Appellee*

v.

Jeffrey Charles Rodd

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: May 15, 2020
Filed: July 16, 2020

_____

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

SMITH, Chief Judge.

Jeffrey Charles Rodd appeals from the district court's[1] denial of his motion for compassionate release pursuant to § 603(b) of the First Step Act, 18 U.S.C. § 3582(c)(1)(A). We affirm.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

I. *Background*[2]

A jury convicted Jeffrey Charles Rodd, an investment advisor who produced and was regularly featured on a Minnesota local radio show, "Safe Money Radio," of four counts of wire fraud under 18 U.S.C. § 1343 and one count of mail fraud under 18 U.S.C. § 1341, for swindling 23 investors out of over $1.8 million. As the owner and operator of his own investment company, Rodd used the radio show to market low-risk investment products—such as annuities of certain insurance companies—to customers to gain their trust and maintain a client base for soliciting participants in a fraudulent investment scheme. Rodd solicited money for the scheme by enticing prospective investors with promises of liquidity, safety, and a 60% six-month return. Rodd instead used the money for personal and business expenses, hiding behind false assurances of security and payouts to his early investors.

At sentencing, the district court calculated an applicable Guidelines sentencing range of 70 to 87 months' imprisonment. The government moved for an upward departure to 120 months' imprisonment based on Rodd's numerous fraudulent schemes and the harm caused to his victims, many of whom lost their life's savings just as they were preparing to retire. Rodd moved for a downward variance based in part on "numerous medical conditions that will require additional surgeries and procedures in the future." Def.'s Sent'g Mem. at 4, *United States v. Rodd*, No. 0:13-cr-00230-ADM-JSM (D. Minn. Sept. 9, 2014), ECF No. 55. The presentence investigation report (PSR) reported that

> between October 2012 and July 2014,. . . Rodd had been "treated for cellulitis and abscess of his left foot; left heel ulcer debridement; hip replacement; multilevel cervical spondylosis; minimal C3-4 retrolisthesis;

---

[2]Portions of the background section are taken from our prior opinion, *United States v. Rodd*, 790 F.3d 873 (8th Cir. 2015), without further attribution.

peripheral vascular disease; temporomandibular joint disorder; carpal tunnel syndrome, bilateral; congestive heart failure; anemia; hypertension; chronic atrial fibrillation; osteoarthritis; morbid obesity; diabetes mellitus; and possible renal failure."

*United States v. Rodd*, No. 0:13-cr-00230-ADM-JSM , 2019 WL 5623973, at *3 (D. Minn. Oct. 31, 2019) (quoting PSR at 10).

At sentencing, Rodd stated to the court, "I got 30 medical problems going on." Sent'g Tr. at 29, *United States v. Rodd*, No. 0:13-cr-00230-ADM-JSM (D. Minn. Sept. 19, 2014), ECF No. 72. His counsel argued that "it's going to be much more difficult for [Rodd] to receive the medical treatments that he needs" "if incarcerated." *Id.* at 18. Counsel requested a sentence that did not "include incarceration." *Id.*

The court acknowledged that Rodd had expressed "some sort of level of remorse," but observed that "it seems more like . . . remorse that you got caught." *Id.* at 31. The court reminded Rodd that although the case has had "an effect on your health and your life, . . . one cannot read the letters and the submissions of the various victims in this case without a realization that it's altered very significantly lots of lives." *Id.* at 30. According to the court, the trial evidence showed that Rodd "lied over and over and over again." *Id.* at 30–31. Taking into account the sentencing factors under 18 U.S.C. § 3553(a), the court found that a sentence of 87 months' imprisonment was "appropriate under the circumstances in light of some mitigating factors with regard to [Rodd's] health and age and lack of prior criminal record." *Id.* at 36. The court noted it had not taken Rodd "into custody immediately after the verdict. . . . based on health reasons." *Id.* The court wanted to ensure that Rodd "got that hip replacement surgery, which has now been accomplished." *Id.* The court found "that Mr. Rodd should be immediately evaluated for incarceration in a medical facility and that his designation occur as quickly as possible and be in Minnesota if that's

consistent with his medical disabilities." *Id.* at 37. This court subsequently affirmed Rodd's 87-month sentence. *See Rodd*, 790 F.3d at 875.

From October through December 2014, Rodd was first incarcerated at a Federal Prison Camp in Duluth, Minnesota. From January 2015 through August 2017, he was incarcerated at the Federal Medical Center in Rochester, Minnesota ("FMC Rochester"). He was later transferred in September 2017 to the Federal Medical Center in Lexington, Kentucky ("FMC Lexington"). According to the Federal Bureau of Prisons' (BoP) website, Rodd's anticipated release date is November 21, 2020. *See* https://www.bop.gov/inmateloc/ (last visited July 10, 2020).[3]

On January 22, 2019, the BoP reviewed Rodd's Individualized Reentry Plan (IRP). According to the IRP, Rodd was assigned "CARE3" on November 10, 2014, which is described as "unstable, complex chronic care." Exs. at 3, *United States v. Rodd*, No. 0:13-cr-00230-ADM-JSM (D. Minn. June 10, 2019), ECF No. 78-1 (all caps omitted). The IRP classified Rodd's current care assignments as only "lower bunk required" as of September 28, 2018. *Id.* (all caps omitted).

On February 1, 2019, Rodd submitted a request to the warden of FMC Lexington to be considered for compassionate release. *See* 18 U.S.C. § 3582(c). Rodd failed to receive an administrative response within 30 days. *See id.* § 3582(c)(1)(A).[4]

---

[3]At the time the district court ruled on Rodd's motion, Rodd's anticipated release date was January 10, 2021. Since that time, however, "the BoP has credited Rodd with an additional [seven] days of good conduct credit per year" pursuant to § 402 of the First Step Act. Appellee's Br. at 10.

[4]Rodd actually sent two requests for compassionate release to the warden. The warden mistakenly construed Rodd's requests as seeking to participate in the Elderly Home Confinement Pilot Program. The BoP determined that Rodd was ineligible for the program because he had not yet reached the requisite age or two-thirds' service of his sentence. It was not until after Rodd filed his sentence-reduction motion with the

On June 10, 2019, Rodd moved for compassionate release pursuant to § 603(b) of the First Step Act, 18 U.S.C. § 3582(c)(1)(A). In his pro se motion, Rodd focused primarily on "[a] number of injuries and traumatic matters" he suffered while incarcerated. Pro Se Mot. to Reduce Sentence at 1, No. 0:13-cr-00230-ADM-JSM (D. Minn. June 10, 2019), ECF No. 78. First, Rodd stated that "[o]n November 5, 2014, [he] was involved in a wheel chair accident causing his left front tooth to come out, abrasions on his left elbow, left knee with a bone spur and his left foot being twisted under the chair." *Id.* at 2. According to Rodd, he did not receive physical therapy or wound care for his injuries. Rodd provided medical records from November 6, 2014, describing the wheelchair accident and injuries. The records show that Rodd scraped his left elbow and left knee, twisted his left foot in the fall, and was denied physical therapy. However, these records do not mention Rodd's tooth being knocked out. According to a radiology report from February 2019, Rodd had an "8mm thin calcified body projecting anterior" to his left kneecap, Exs. at 10; however, the medical records do not state that this bone spur resulted from Rodd's scraped knee in 2014.

Second, Rodd claimed that, while waiting outdoors in line for pills on December 15, 2014, his "eyes froze as the temperature was reported at 52–56 below zero by the T.V. stations inside the Clinic. [He] began going blind shortly after this."
Pro Se Mot. to Reduce Sentence at 2. Rodd submitted a medical report from January 21, 2015, showing that he had a routine vision screening on that date and "ha[d] no vision related complaints." Exs. at 12. The report further stated, "Inmate has a pair of non-prescription reading glasses . . . that are used for screening with corrective lenses.

---

district court that the BoP reconsidered Rodd's April 17, 2019 request under § 3582(c)(1)(A). In July 2019, the BoP evaluation team recommended against release. The warden denied Rodd's request for compassionate release. The warden explained that Rodd is "currently receiving ongoing medical care that is in response to [Rodd's] ongoing needs"; therefore, Rodd failed to "meet the criteria of extraordinary or compelling." Gov't Ex. 3 at 7, *United States v. Rodd*, No. 0:13-cr-00230-ADM-JSM (D. Minn. Sept. 5, 2019), ECF No. 81-1.

Will refer to Optometry due to impaired visual acuity." *Id.* On November 28, 2016, Rodd reported to one of his eye surgeons that he had "frozen both eyes 12/2014." *Id.* at 36.[5] Rodd submitted medical records showing that he had cataract surgery on his left eye on April 11, 2017, and cataract surgery on his right eye in August 12, 2017.

Third, Rodd represented that he was assaulted on two separate occasions by fellow inmates. The first assault occurred on December 30, 2014; Rodd did not identify any injuries or medical treatment he received after the assault. The second assault occurred on April 17, 2018. To substantiate the second assault, Rodd submitted a message he wrote recounting the incident; Rodd claimed to have "suffered mental trauma, anguish, nerve damage to my face etc. Headaches, disparagement etc." *Id.* at 70.

Fourth, Rodd claimed in his motion that on November 16, 2015, he "underwent a traumatic E[C]G test" and "was taken to the Mayo Clinic by ambulance" the next day. Pro Se Mot. to Reduce Sentence at 2. The medical reports that Rodd submitted show that "the ECG indicated that [Rodd] has a (L) anterior fascicular block as well as a bifascicular block." Exs. at 17. Rodd reported being "more short of breath than normal" and feeling "light headed"; "he denied having any chest pain." *Id.* Rodd was assessed with congestive heart failure that had "[w]orsened." *Id.* at 18. Rodd was moved to a hospital "for further evaluation." *Id.* at 17. Rodd "remain[ed] stable through[o]ut his evaluation . . . and was in stable condition when he left." *Id.* at 19. He returned to FMC Rochester the same day. Upon his return, Rodd had "no complaints and [was] in no apparent distress." *Id.* at 20.

---

[5]Rodd self-reported having "frozen both eyes"; the eye surgeon's report does not state that cold weather caused Rodd's cataracts. *See id*.

Fifth, Rodd also discussed in his motion a blister on the side of his foot "that burns 24 hours a day everyday." Pro Se Mot. to Reduce Sentence at 3. According to Rodd, the doctor dismissed his pain as resulting from arthritis.

Sixth, Rodd claimed that on June 16, 2017, "the housing unit placed two individuals with unknown skin diseases in [his] room as. . . a quarantine." *Id.* at 3. Rodd, however, does not claim that he contracted the skin disease or any other condition as a result.

Seventh, Rodd recounted in his motion the medical conditions he had previously been diagnosed with: "Atrial Fibrilation, Congestive Heart failure, High Blood Pressure, Depression." *Id.* In a subsequent filing, Rodd added that he also suffers from headaches, deep eye pain, other eye problems, hearing loss, a double heart block, dizziness, and pain in his right arm.

In his motion, Rodd represented that he is self sufficient, stating, "I walk with a cane, however, I can see and I am fully able to take care of my[s]elf." Pro Se Mot. to Reduce Sentence at 5. Rodd sought release, in part, by stating that he would live with his 86-year old mother who was ill, lived alone, and had fallen many times. In a subsequent filing, however, Rodd asserted that the district court should find that he had demonstrated "a substantially diminished ability to provide self-care within the correctional facility environment" and that his blindness was an extraordinary and compelling reason for early release. Movant's Opp'n to Gov't Resp. to Def.'s Mot. under 18 U.S.C. § 3582 for Compassionate Release at 14, *United States v. Rodd*, No. 0:13-cr-00230-ADM-JSM (D. Minn. Oct. 11, 2019), ECF No. 83.

In support of his motion, Rodd expressed "extreme[] remorse[]" and accepted "complete responsibility" for his crimes. Pro Se Mot. to Reduce Sentence at 4, 5. According to Rodd, his "intentions were not to defraud someone but to include them

-7-

in the success of [his] business and radio expansion." *Id.* at 4. Additionally, Rodd represented that he had behaved well in prison and had taken many education courses.

In ruling on Rodd's motion for compassionate release, the district court recognized that the First Step Act amended § 3582(c) to permit an inmate to bring a motion for compassionate release to the court if the inmate has exhausted his administrative appeals. The inmate also may go directly to the court if the warden of the inmate's facility does not respond to the inmate's compassionate-release request within 30 days.

Prior to the First Step Act, "questions of compassionate release came to the Court 'upon motion of the Director of the Bureau of Prisons.'" *Rodd*, 2019 WL 5623973, at *2. The district court noted that the Sentencing Commission has not updated its policy statements concerning compassionate release following the passage of the First Step Act. As a result, "the Sentencing Guidelines address only the review of a motion by the Director of the BOP, not upon the motion of a defendant." *Id.* (citing U.S.S.G. § 1B1.13 app. n.1). Section 1B1.13 provides "four examples of 'extraordinary and compelling reasons'" for compassionate release. *Id.* The district court acknowledged that "[c]ourts disagree over whether Congress intended the First Step Act to expand the definition of 'extraordinary and compelling reasons'" beyond that set forth in § 1B1.13. *Id.* at *3 (citing *United States v. Lynn*, No. 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019)). While some courts adhere to "the pre-First Step Act policy statements," "[o]ther courts [have] ruled that the pre-First Step Act policy statements are inapplicable, and that a judge has discretion to determine, at least until the Sentencing Commission acts, what qualifies as 'extraordinary and compelling reasons.'" *Id.* (citing *United States v. Brown*, 411 F. Supp. 3d 446, 448–51 (S.D. Iowa Oct. 8, 2019)).

The district court first analyzed Rodd's motion under the policy statement set forth in § 1B1.13. *Id.* (setting forth section entitled, "Adhering to the Sentencing

Guidelines Policy Statements"). Under § 1B1.13, a defendant's medical condition may constitute an extraordinary and compelling reason to warrant a sentence reduction. U.S.S.G. § 1B1.13 app. n.1(A)(i)–(ii). The court noted the medical conditions afflicting Rodd, as well as Rodd's contention that "he has suffered injuries and physical deterioration while incarcerated." *Rodd*, 2019 WL 5623973, at *3. But the court concluded that "treatment possibilities" existed for Rodd's "pain and discomfort." *Id.* Furthermore, the court determined that "[n]one of Rodd's self-reported or medically diagnosed ailments approach th[e] level of seriousness" of the "health crises contemplated by the Sentencing Guidelines"; specifically, "meta[stat]ic solid-tumor cancer, amyotrop[h]ic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.* (quoting U.S.S.G. § 1B1.13 app. n.1(A)(i)).

The court also evaluated whether Rodd's medical conditions "substantially diminish[ed]" his ability "to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." *Id.* at *4 (quoting U.S.S.G. § 1B1.13 app. n.1(A)(ii)). The court reviewed Rodd's medical records, which indicated that "Rodd's medical issues are being monitored and are under control at the FMC Lexington." *Id.* Furthermore, the court cited Rodd's statement that he was "fully able to take care of [himself]." *Id.* (quoting Pro Se Mot. to Reduce Sentence at 5).

After analyzing whether Rodd satisfied the "extraordinary and compelling reasons" criteria set forth in § 1B1.13, the district court assumed that Rodd satisfied a more expansive definition of the phrase and analyzed the compassionate-release motion under 18 U.S.C. § 3553(a). Specifically, the court stated, "Even assuming Congress intended to expand the use of compassionate release with the First Step Act, the Section 3553(a) factors present at sentencing have not changed. Rodd does not qualify for compassionate release." *Id.* The court cited "trial evidence show[ing] Rodd 'lied over and over and over again'"; the impact of Rodd's offense conduct on the victims; and Rodd "provid[ing] excuses for his actions." *Id.* While the court did not expressly discuss all of the § 3553(a) factors, it made clear that it had "[c]onsider[ed]

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed; along with the other Section 3553(a) factors." *Id.* (cleaned up). The court concluded its analysis by stating, "[E]ven assuming a more expansive definition of 'extraordinary and compelling reasons' under the First Step Act, Rodd's Motion is denied." *Id.*

## II. *Discussion*

On appeal, Rodd argues that the district court erroneously denied his motion for compassionate release on two grounds. First, Rodd contends that "the [d]istrict [c]ourt failed to recognize its discretion to determine whether the circumstances in the [m]otion were 'extraordinary and compelling' under Section 3582" as amended by the First Step Act. Appellant's Br. at 9. According to Rodd, the court erroneously "adhered to a pre-First Step Act Sentencing Commission policy statement that explains when the BOP, in its discretion, may determine that there are sufficient 'extraordinary and compelling' circumstances for the BOP to move for a sentence reduction." *Id.* Second, Rodd maintains that the district court abused its discretion in determining that the § 3553(a) factors did not support Rodd's motion for compassionate release.

"We review de novo the applicability of the First Step Act to a defendant's case, including whether a defendant is eligible for a sentence reduction. We review for an abuse of discretion the district court's decision to grant or deny an authorized sentence reduction." *United States v. McDonald*, 944 F.3d 769, 771 (8th Cir. 2019) (internal citation omitted).

Section 3582(c), as amended by the First Step Act, provides, in relevant part, that

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring

-10-

a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier,[6] may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i).

Section 3582(c)(1) permits district courts to grant motions for compassionate release "consistent with applicable policy statements issued by the Sentencing Commission." However, the policy statement in § 1B1.13 regarding compassionate release has not been amended since the passage of the First Step Act.[7] The commentary to § 1B1.13 identifies four categories that constitute "[e]xtraordinary and compelling reasons warrant[ing] the [sentence] reduction," U.S.S.G. § 1B1.13(1)(A): the defendant's medical condition, the defendant's age, the defendant's family circumstances, and other "extraordinary and compelling reason[s]" "[a]s determined by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13 app. n.1. The commentary sets forth what constitutes an extraordinary and compelling medical condition, as follows:

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of

---

[6]"Prior to the First Step Act of 2018, a district court could grant relief under § 3582(c)(1)(A) only on a motion by the BOP." *United States v. Chambliss*, 948 F.3d 691, 693 n.1 (5th Cir. 2020).

[7]"As the Sentencing Commission lacks a quorum to amend the U.S. Sentencing Guidelines, it seems unlikely there will be a policy statement applicable to [compassionate-release] motions brought by defendants in the near future." *United States v. Beck*, 425 F. Supp. 3d 573, 579 n.7 (M.D.N.C. 2019).

life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 app. n.1(A)(i)–(ii).

A defendant qualifies for the age provision under § 1B1.13 if "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." *Id.* § 1B1.13 app. n.1(B).

A defendant's family circumstances constitute extraordinary and compelling reasons when "the caregiver of the defendant's minor child or minor children" dies or is incapacitated or when "the defendant's spouse or registered partner" is incapacitated and "the defendant would be the only available caregiver for the spouse or registered partner." *Id.* § 1B1.13 app. n.1(C).

Rodd concedes that his "health and family concerns do not fall within the three specific circumstances set forth in the Sentencing Commission's pre-First Step Act policy statement." Appellant's Br. at 18–19. But he argues that, following the passage of the First Step Act, the district court was not bound to adhere to the policy statements set forth in § 1B1.13. Rodd contends the district court erred by not concluding that his health and family concerns constituted extraordinary and compelling reasons warranting a sentence reduction under § 3582(c).

We need not determine whether the district court erred in adhering to the policy statements in § 1B1.13. The district court knew its discretion. It expressly stated that "[e]ven assuming Congress intended to expand the use of compassionate release with the First Step Act, the Section 3553(a) factors present at sentencing have not changed" and, as a result, "Rodd does not qualify for compassionate release." *Rodd*, 2019 WL 5623973, at \*4; *see also id.* ("[E]ven assuming a more expansive definition of 'extraordinary and compelling reasons' under the First Step Act, Rodd's Motion is denied."). In other words, the district court assumed that Rodd's health and family concerns constituted extraordinary and compelling reasons for compassionate release. Therefore, we need only determine "whether the district court abused its discretion in determining that the § 3553(a) factors weigh against granting [Rodd's] immediate release." *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020); *see also Chambliss*, 948 F.3d at 693 ("Here, the district court found that Chambliss' terminal illness was an extraordinary and compelling reason for compassionate release. Therefore, the only issue for our consideration is whether the district court abused its discretion by denying compassionate release despite Chambliss' eligibility for that relief." (internal footnote omitted)).

Rodd contends that the district court abused its discretion in denying his compassionate-release motion because it "failed to consider or even mention significant post-sentencing circumstances, including Rodd's deteriorating health and exemplary prison record." Appellant's Br. at 10. But we do not require district courts to

"mechanically recite the sentencing factors listed in 18 U.S.C. § 3553(a)." *United States v. Dailey*, 958 F.3d 742, 747 (8th Cir. 2020). "When considering the § 3553(a) factors, a district court is not required to make specific findings; all that is generally required to satisfy the appellate court is evidence that the district court was aware of the relevant factors." *United States v. Thompson*, 641 F. App'x 641, 650 (8th Cir. 2016) (per curiam) (cleaned up) (applying § 3582(c)). Here, "the court noted its consideration of the § 3553(a) factors at sentencing without specifically discussing [all of] them individually." *Id.* Furthermore, Rodd "advanced his mitigating factors" in his compassionate-release motion, exhibits, and reply memorandum, "and we presume that the district court considered them." *United States v. Williams*, 791 F.3d 809, 811 (8th Cir. 2015). Reviewing the record, we are confident the district court appropriately reviewed the record evidence and found Rodd's case not sufficiently persuasive to warrant relief. "[A]lthough [Rodd] may disagree with how the district court balanced the § 3553(a) factors" in adjudicating his compassionate-release motion, "that is not a sufficient ground for reversal." *Chambliss*, 948 F.3d at 694.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____